ORDERED.



Dated: June 1, 2011

Eileen W. Hollowell, Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| SAGUARO RANCH DEVELOPMENT CORPORATION, | Joint Case No. 4:09-bk-02490-EWH |
| Debtor. | |
| In re: | |
| PCC INVESTMENTS, LLC, | Case No. 4:09-bk-02484-EWH |
| Debtor. | |
| In re: | |
| SAGUARO GUEST RANCH MANAGEMENT CORPORATION, | Case No. 4:09-bk-02489-EWH |
| Debtor. | |
| In re: | |
| SAGUARO RANCH INVESTMENTS, LLC, | Case No. 4:09-bk-02492-JMM |
| Debtor. | |
| In re: | |
| SAGUARO RANCH REAL ESTATE CORPORATION, | Case No. 4:09-bk-02494-EWH |
| | **MEMORANDUM DECISION** |
| Debtor. | |

# I. INTRODUCTION

The Debtors collectively own over 1,000 acres of land in the Tortolita Mountains outside of Tucson ("Property"). The Property was acquired over a ten-year period by Steven Phinny ("Phinny") and members of his family who have collectively invested over $30 million in its acquisition and development. Phinny's vision was to create a master planned luxury community ("Project") with maximal open space and minimal impact on the environment. The original business plan was to develop and sell approximately 180 four to five acre lots to buyers who would build custom houses on the improved lots. The Project was to be developed in stages and included plans for a restaurant, stables, a spa facility, a horse ranch, tennis courts, hiking and riding trails, and one large lot ("Lot 50"), which Phinny originally planned to develop as sixty-three casitas.

In late 2005, the Debtors borrowed $50 million from Kennedy Funding Inc. and Anglo-American Financial, LLC (collectively "Kennedy") to finance the improvements and infrastructure needed to develop the Project. Between 2004 and 2008, lots sold for an average price of over $1 million. However, with the onset of the "Great Recession," the Project floundered. In February 2009, the Debtors filed for Chapter 11 protection. There have been no lot sales during the pendency of the Debtors' Chapter 11 cases.

For over two years, the Debtors have attempted to reorganize or reach a consensual agreement with Kennedy. In 2010, the Debtors and Kennedy engaged in mediation efforts. When the mediation failed, the Debtors attempted to confirm a plan of reorganization over Kennedy's objection. When that plan was denied confirmation,

2

1   Kennedy was granted stay relief. The Debtors appealed the stay relief order, but there

2   is no stay of the appeal. Kennedy's Trustee's Sale is set for June 9, 2011.

3       On March 16, 2011, the Debtors proposed another plan of reorganization.

4   Evidentiary hearings on that plan were held in mid-May 2011. Notwithstanding the

5   efforts of the Debtors, their lawyer and the lawyer for the Unsecured Creditors

6   

7   Committee, the Debtors' latest plan cannot be confirmed.

8

9                   II. **FACTS AND PROCEDURAL HISTORY**

10

11      The Debtors filed for Chapter 11 on February 13, 2009. On the petition date,

12  they had been in default on the $50 million Kennedy loan ("Loan") since May 2008. The

13  Loan fully matured on December 31, 2008.

14      On February 8, 2010, the Debtors filed a motion seeking financing on a

15  superpriority basis under § 364(c)[1] ("Financing Motion") in which they asserted that the

16  Property's as-is value was approximately $64 million. Kennedy, in its opposition,

17  

18  asserted the Property's as-is value was $14.7 million.[2]

19      In March 2010, Kennedy made the § 1111(b)(2) election and filed a motion

20  for relief from stay ("Stay Relief Motion") in which it asserted that, as of January 2010,

21  the total amount of its claim was approximately $34 million. Also in March 2010, the

22  Debtors filed a disclosure statement and plan of reorganization ("1st Plan").

23

24  _____

25  [1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code,
    11 U.S.C. §§ 101-1532. All "Rule" references are to the Federal Rules of Bankruptcy
26  Procedure, Rules 1001-9037.

27  [2] Kennedy has maintained throughout this case that $14.7 million is the value of the Property.

28                                   3

On April 26, 2010, after three days of hearings on the Financing Motion, the court found the as-is value of the Property to be $49 million, which did not leave enough equity in the Property to grant the Financing Motion.

In May 2010, the court conducted a hearing on the Stay Relief Motion. Because the Property had been found to have a value greater than the amount of Kennedy's claim, the Stay Relief Motion was denied without prejudice and thereafter "rode" the calendar with any hearings on confirmation.

From approximately May to December 2010, the Debtors and Kennedy engaged in settlement efforts, including participating in a formal mediation. Late in 2010, the settlement efforts fell apart. After the settlement efforts failed, the Debtors moved forward with their efforts to confirm the 1st Plan. A combined hearing on confirmation of the 1st Plan and the Stay Relief Motion was set for late January 2011. Shortly before the commencement of the hearing, the Debtors proposed another plan ("2nd Plan"), which the court found did not need to be re-noticed or re-balloted because the changes in the 2nd Plan were not adverse to any of the creditor classes.

On January 31 and February 4, 2011, evidentiary hearings were held on the 2nd Plan and the Stay Relief Motion. The Debtors put on evidence that the Property had a current value of $17.25 million. The court denied confirmation of the 2nd Plan because the treatment of Kennedy's claim did not satisfy the fair and equitable requirements of § 1129(b)(2)(A). Based on the Debtors' revised value of the Property and the denial of confirmation of the 2nd Plan, Kennedy was granted stay relief under § 362(d)(2) ("Lift Stay Order"). Debtors appealed the Lift Stay Order, but there is no stay pending the appeal. There is no cross appeal.

4

On March 16, 2011, the Debtors filed another plan ("3rd Plan"). Kennedy filed objections to the 3rd Plan and also argued that the appeal of the Lift Stay Order divested this court of jurisdiction to consider confirmation of the 3rd Plan. Evidentiary hearings on the 3rd Plan were held on May 16 and 20, 2011.

## III. ISSUES

A.     Does the court have jurisdiction to consider confirmation of the 3rd Plan?

B.     Is the 3rd Plan Confirmable?

## IV. STATEMENT OF JURISDICTION

Normally a decision regarding confirmation of a Chapter 11 plan is part of a bankruptcy court's core jurisdiction under 28 U.S.C. § 157(b)(2)(L). Kennedy argues, however, that the appeal of the Lift Stay Order has divested this court of that jurisdiction.

Kennedy cites to cases that stand for the well-known proposition that once an appeal is filed, a lower court cannot decide any issue involved in the appeal. See Neary v. Padilla, 222 F.3d, 1184, 1190 (9th Cir. 2000); In re Bialac, 694 F.2d 625 (9th Cir. 1982). However, due to the multi-layered nature of bankruptcy cases, appellate courts have recognized that the standard is applied more flexibly in the bankruptcy context. As the Fifth Circuit explained recently, Bank of N.Y. Trust Co. N.A. v. Pacific Lumber Co. (In re Scopac), 624 F.3d 274, 280 (5th Cir. 2010):

> [T]his court has 'repeatedly recognized that, when a notice of
> appeal has been filed in a bankruptcy case, the bankruptcy court
> retains jurisdiction to address elements of the bankruptcy

5

proceeding that are not the subject of that appeal.' Citing In re Transtexas Gas Corp., 303 F.3d 571, 580 at n. 2 (5th Cir. 2002). It may even continue to address matters indirectly implicated in the appeal. Accordingly, this court has specifically rejected 'the broad rule that a bankruptcy court may not consider any request which either directly or indirectly touches upon the issues involved in a pending appeal and may not do anything which has any impact on the order on appeal.' In re Sullivan Cent. Plaza I, Ltd., 935 F.2d 723, 727 (5th Cir. 1991). These precedents point toward a functional test: 'once an appeal is pending, it is imperative that a lower court not exercise jurisdiction over those issues which, although not themselves expressly on appeal, nevertheless so impact the appeal so as to interfere with or effectively circumvent the appeal process.' In re Whispering Pines Estates, Inc., 369 B.R. 752, 759 (B.A.P. 1st Cir. 2007).

It is clear that the appeal of the Lift Stay Order bars this court from disturbing the finding that there is no equity in the Property for the Debtors. This court also cannot reconsider its determination that the 2nd Plan was unconfirmable. But, the court does neither of those things in this decision. What the court has been asked to decide is whether the 3rd Plan is confirmable. A determination on confirmation of the 3rd Plan will not have the effect of interfering or circumventing the Lift Stay Order because if the 3rd Plan is confirmed, the Property will revest in the Debtors (3rd Plan, Article IX) and, as a result, there is no longer an automatic stay in effect. See Hillis Motors, Inc. v. Hawaii Automobile Dealers' Ass'n, 997 F.2d 581, 589 (9th Cir. 1993).

The court recognizes that a decision on confirmation of the 3rd Plan could have an impact on Kennedy's rights, but events happen all the time during the pendency of an appeal that may affect the parties' rights. For example, a court's post-confirmation determination of the allowability and amount of a claim may affect the rights of the parties who are appealing a confirmation order. That was the matter at issue in Scopac where the Fifth Circuit found:

6

The specific question, then, is whether separate consideration of the § 507(b) issue would interfere with or allow the circumvention of the appeal of the confirmation order. We answer this question in the negative.

624 F.3d at 280.

Finally, the court notes that a determination that the Lift Stay appeal divested this court of jurisdiction to consider confirmation of the 3rd Plan would most likely result in a dismissal of the appeal and a request for an expedited determination on confirmation. The court believes it has jurisdiction and also believes, given the hard-fought nature of this case, it would eventually have to reach the merits. It does so in the balance of this Memorandum.

## V. <u>DISCUSSION</u>

### A. <u>Summary of the 3rd Plan</u>

The 3rd Plan proposes to pay Kennedy's § 1111(b)(2) claim by paying $17,250,000 over five years at 6% interest. The complete payoff of $28+ million, which the Debtors assert is the full amount of Kennedy's § 1111(b)(2) claim, will occur at the end of year seven of the nine-year plan term. Plan payments are to be made from the net proceeds of 131 lot sales. Average lot sales are estimated at $500,000 in year one and increase by 5% a year thereafter. The plan assumes twenty sales in year one and fifteen sales between years two and eight. Lot release prices are set at approximately $214,000, which is roughly 43% of the average lot sales price. The 3rd Plan also

7

provides for minimum payments ("Minimum Payments") to be made to Kennedy in years one through five in the event that lot sales do not meet the Debtors' projections.[3]

The source of the funds for the Minimum Payments is listed as "any other source available to the Debtors." (3rd Plan, p. 21.) On the last day of the confirmation hearing, Phinny testified that he held a partnership interest worth $4 million, which he would assign to Kennedy to assure that the Minimum Payments are made.

The 3rd Plan provides for a cash infusion of $3 million from Phinny's mother. Pursuant to a stipulation with Pima County, approximately $900,000 of that amount is to be dedicated to pay pre-petition real property taxes. As a result of that stipulation, Pima County voted to accept the Plan, giving the Debtors an additional accepting class.[4] The balance of the new cash infusion will be used to pay for development costs due to the City of Marana and other operating costs.

The 3rd Plan provides for the sale of all but ten acres of Lot 50, the so-called "casita lot," for $3,250,000. Kennedy will retain its lien on the remaining ten acres and will also receive the net sale proceeds after payment of $250,000 in outstanding real property taxes.

**B.**  **Confirmation Requirements**

The Debtors bear the burden, by a preponderance of the evidence, of demonstrating that the 3rd Plan meets all of the confirmation requirements of § 1129. In re Bashas' Inc., 437 B.R. 874, 902 (Bankr. D. Ariz. 2010). Rather than address each of

---

[3] The Minimum Payments amounts per year are as follows: year 1 – $5 million, years 2 to 5 – $3.5 million per year, total = $19 million.

[4] There were four other accepting classes.

8

the § 1129 requirements, this decision will focus on the two sections of § 1129 in which

the 3rd Plan fails to satisfy the Debtors' burden: the feasibility requirement of

§ 1129(a)(11) and the fair and equitable requirement of § 1129(b)(2)(A).

### 1.  Feasibility

The 3rd Plan assumes there will be twenty lot sales in year one at an average

price of $500,000. It then assumes fifteen sales a year in years two through eight, with

the average lot price rising to over $700,000 in year nine. Under the Debtors'

projections, the portion of Kennedy's § 1111(b)(2) claim entitled to present value

payments will be paid in full in five years at 6% interest. The total amount of Kennedy's

claim will be paid off in seven years.[5]

### a.  Calculation of the Amount of Kennedy's § 1111(b)(2) Claim

The amount of Kennedy's allowed § 1111(b)(2) claim is disputed by the parties.

The Debtors assert that the total claim is $28 million, Kennedy claims it is approximately

$40 million. The total amount of the claim affects the feasibility of the Plan because the

larger the total allowed claim, the longer it will take the Debtors to pay it.

Kennedy argues, because the 3rd Plan does not (and cannot) cure and

reinstate the fully matured Loan, that default interest continues to accrue pursuant to

the Loan's terms until it is modified by a confirmation order. Kennedy correctly points

out that § 506(b) does not prohibit the accrual of post-petition interest but only

---

[5]  The effect of the § 1111(b)(2) election is to give the electing creditor a stream of payments equal to the present value of its collateral and totaling the creditor's claim. In re First Fed. Bank of Calif. v. Weinstein (In re Weinstein), 227 B.R. 284, 294 (B.A.P. 9th Cir. 1998).

9

determines whether any portion of that interest is entitled to secured status. In re SNTL Corp., 571 F.3d 826, 842 (9th Cir. 2009).

The problem with Kennedy's analysis is that it ignores the fact that § 502, which is the section of the Code that determines allowance of claims, prohibits claims for unmatured interest. See § 502(b)(2). The cases Kennedy cites in support of its argument that it should be permitted to accrue post-petition interest involve the allowance of attorneys' fees -- not interest. Because § 502 does not contain a provision specifically disallowing a claim for attorneys' fees, courts have recognized that unsecured creditors who have a contractual or statutory right to attorneys' fees may include those fees as part of an allowed unsecured claim. See, e.g. SNTL Corp., 571 F.2d at 841-43; see also Welzel v. Advocate Realty Invs. LLC (In re Welzel), 275 F.3d 1308, 1317-18 (11th Cir. 2001). But none of those cases involve the allowance of post-petition interest, and as those cases recognize, § 502(b)(2) bars post-petition interest as part of an allowed claim. See SNTL, 571 F.3d at 842 ("[T]he allowance functions of section 506(b) and 502(b) have been incorrectly conflated. Section 502(b), which applies to claims generally, does disallow unmatured interest"); see also Welzel, 275 F.3d at 1318 ("The entire claim to [attorneys'] fees is allowable under § 502 as long as the exceptions in subsection (b) do not apply") (emphasis added).

Furthermore, if Kennedy's argument is correct, its § 1111(b)(2) election would result in it receiving better treatment than other unsecured creditors because it would receive post-petition interest on the unsecured portion of its claim, which other

10

unsecured creditors are barred from receiving by § 502(b)(2). While the § 1111(b)(2) election was intended to prevent debtors from obtaining a windfall in the event that an undersecured creditor's collateral appreciates in value post-confirmation, there is no evidence that it was intended to prefer undersecured § 1111(b)(2) creditors over other unsecured creditors. The legislative history of § 1111(b)(2) does not support such a result since it specifically recognized that an electing § 1111(b)(2) creditor was only entitled to adequate protection "to the extent of the value of the collateral, not to the extent of the creditor's allowed secured claim, which is inflated to cover a deficiency as a result of such election." Gen. Elec. Mort. Corp. v. South Village, Inc. (In re South Village, Inc.), 25 B.R. 987, 999 at n. 23 (Bankr. D.Utah 1982) citing 124 Cong. Rec. H11 (daily ed. Sep. 28, 1978).

Kennedy also argues that because the 3rd Plan assumes the Debtors will be solvent in nine years, it is entitled to post-petition interest on its claim. This is simply an argument that a solvent debtor must pay unsecured creditors' interest before equity can receive any return. Based on a $17,250,000 confirmation value of the Property, the Debtors are not solvent.[6] Also, future projections do not affect the analysis of what constitutes an allowed claim under § 502(b), which provides in relevant part: "The court, after notice and a hearing, shall determine the amount of such claim . . . as of the date of the filing of the petition. . ." (emphasis added).

---

[6] The Plan confirmation is the proper time to value property, which is the subject of an § 1111(b)(2) election. In re Stanley, 185 B.R. 417, 425 (Bankr. D.Conn. 1995); In re 500 Fifth Ave. Assocs., 148 B.R. 1010, 1016 (Bankr. S.D.N.Y 1993).

11

Kennedy cannot claim post-petition unmatured interest as part of its total allowed § 1111(b)(2) claim, but under the holding of <u>SNTL</u>, it may include attorneys' fees to the extent such fees are permitted by the Loan or Arizona law. Based on this analysis, the Debtors' estimate of the total amount of Kennedy's § 1111(b)(2) claim is closer to being accurate than Kennedy's estimate.[7]

### b. Feasibility Evidence

The Debtors put on evidence indicating that they currently have ten lots in escrow. The Debtors assert all of the pending escrows will close if, and only if, the 3rd Plan is confirmed. The Debtors also put on evidence that the parties to those contracts have the financial ability to perform.[8]

Given the distressed real estate market in Arizona, it is impressive that the Debtors have so many lots in escrow. Impressive, and probably unsustainable. Many of the parties to the contracts have a strong personal relationship with Phinny or with individuals who already own property at the Project. Evidence presented by Kennedy indicates that lots have recently been listed or sold at the Project in the mid-$300,000 range. The Debtors counter that many of those lots are bank owned and not the same quality as the lots in escrow. It is the nature of real property that each parcel is unique, but it is safe to assume that some of the lots proposed to be sold under the 3rd Plan will

---

[7] Kennedy makes an alternative argument that, even if it is not entitled to post-petition interest, it is entitled to a claim under § 507(b) for the drop in value in the Property from the $49 million value set by the court in April of 2010 to the $17,250,000 confirmation value. Presumably, the Debtors will counter that there has been no diminution in value based on Kennedy's $14.7 million valuation. Because the 3rd Plan does not satisfy other confirmation requirements, the court does not need to decide the issue.

[8] For example, the Chairman of Ford Motor Company has two lots in escrow.

12

not have the spectacular attributes of some of the lots currently in escrow. In addition, the fact that the lower-priced lots are bank-owned does not mean that the sale or listing prices for those lots do not reflect market prices. Currently in Arizona, all real estate markets are affected by bank ownership. Because banks wish to rid themselves of non-performing assets they generally will sell at lower prices than other owners--which has the effect of driving down fair market values. In the current environment, the court cannot simply ignore comparable sales and listings because the Property is bank owned.

All ten of the escrowed contracts are subject to "free look" periods which permit the proposed buyers to cancel the contract for any reason including, but not limited to, the possibility that the buyer might find a better price. Nevertheless, the 3rd Plan assumes that all ten escrows will close and ten more will surface before the end of the year. The evidence does not support such optimism. For example, the Debtors' appraiser assumed that in the next few years, sales would average about one every other month, which is only six sales a year. (DE 458, Ex. A at 40). The 3rd Plan's projections are also well above the pre-petition sales figures for the Project of slightly more than nine lots per year. (Ex. A at 54). It is true that the 3rd Plan sets lot prices at far below pre-petition levels, but it is not clear that the lower prices will generate the high demand assumed by the 3rd Plan. The 3rd Plan's projections are also based on the assumption that, post-confirmation, everything will go right for the Debtors, including timely obtaining of all necessary regulatory and development permits and the Debtors being able to keep lot development costs well below historic numbers.

13

In recognition of the possibility that the Debtors' projections may not materialize, the 3rd Plan provides for Minimum Payments to Kennedy in the first five years of the plan term. The Minimum Payments total $19 million, which would be enough to assure that Kennedy receives the present value payments portion of its § 1111(b)(2) claim, but not the full amount of that claim. More importantly, the source of the Minimum Payments is uncertain. The 3rd Plan provides the payments will be made "from any source available to the Debtors." In response to a question from the court about where the payments would come from, Phinny testified that he has an interest in a partnership worth $4 million, which could be assigned to Kennedy to assure the Minimum Payments are made. Even assuming that Phinny makes that assignment, $4 million does not cover Kennedy's claim. There would have to be additional sources, presumably members of the Phinny family, who have invested over $30 million in the Project and who have advanced $850,000 to keep the Debtors operating post petition.[9] Phinny's testimony suggested that, post-confirmation, the family would continue to do whatever had to be done to preserve the Project. But, there is nothing in the 3rd Plan that requires Phinny or anyone else to make the Minimum Payments. Accordingly, the Minimum Payments do not assure performance under the 3rd Plan.

In order to satisfy § 1129(a)(11), a debtor need only establish that a plan has a reasonable probability of success. In re Danny Thomas Prop. II Ltd., 241 F.3d 959, 962 (8th Cir. 2001). But, a court should not approve a plan if it depends on successful fulfillment of every underlying assumption of the debtor. In this case, the Debtors

---

[9] Because the post-petition advances were never approved by the court, they can only constitute equity contributions.

14

assume the best of all possible post-confirmation worlds. The oft-quoted language of In re Pizza of Hawaii, 761 F.2d 1374, 1382 (9th Cir. 1985), which warns against the confirmation of "visionary schemes," applies here. Considering the evidence as a whole, the Debtors have failed to meet their burden of demonstrating that the 3rd Plan is feasible.

> 2.     The 3rd Plan Is Not Fair and Equitable

The 3rd Plan may only be confirmed over Kennedy's objection if it satisfies the "fair and equitable" requirements of § 1129(b). The Code provides three alternative ways for a debtor to provide fair and equitable treatment to a non-consenting, impaired secured creditor. Sections 1129(b)(2)(A)(i)(I) and (II) require that the objecting creditor retain 100% of its lien on its collateral and receive a stream of payments equal to the present value of that collateral. Section 1129(b)(2)(A)(ii) requires that the objecting creditor receive 100% of the sale proceeds generated by its collateral or a lien on 100% of those proceeds. Because the 3rd Plan requires Kennedy, as lots are sold, to release its lien on the Property and permits the Debtors to retain a portion of the lot sale proceeds to fund operating costs of the Project, it cannot be confirmed under the first two alternatives. It can only be confirmed if it satisfies the last of the alternatives, which requires that Kennedy receive the "indubitable equivalent" of its claim. § 1129(b)(2)(A)(iii).

To satisfy § 1129(b)(2)(A)(iii), the Debtors must show, by a preponderance of the evidence, that the 3rd Plan meets the standard set forth in Metropolitan Life Insurance Co. v. Murel Holding Corp. (In re Murel Holding Corp.), 75 F.2d 941 (2nd Cir. 1935) – that when a plan of reorganization denies a creditor its money or its collateral, the

15

creditor receive a "substitute of the most indubitable equivalent." Id. at 942. The substitute provided to the creditor "must both compensate for present value and insure the safety of the principal." Am. Mariner Indus., 734 F.2d 426, 433 (9th Cir. 1984), overruled on other grounds by United Savings Ass'n v. Timbers of Inwood Forest, 484 U.S. 365, 376, 108 S.Ct. 626 (1988).

A debtor may use several methods to provide a secured creditor with the indubitable equivalent of its claim, including cash payments, payments over time, abandonment of collateral and substitution of collateral. In re Bryant, 439 B.R. 724, 747-748 (collecting cases). The 3rd Plan purports to provide Kennedy with the present value of its claim by paying Kennedy the confirmation value of the Property over five years at 6% interest.[10] Even the proposed present-value payments are assumed to be adequate, the Debtors still have to meet the second "safety of the principal" requirement of the indubitable equivalent standard. One court has explained that means a debtor must demonstrate there is "no reasonable doubt" that its creditor will receive the full value of what it bargained for. In re Inv. Co. of the S.W., 341 B.R. 298, 319 (B.A.P. 10th Cir. 2006). Because the Debtors have not satisfied their burden on feasibility, they cannot meet that standard.

Even if the Debtors had demonstrated that the 3rd Plan was feasible, the 3rd Plan still falls short of meeting the indubitable equivalent standard because it

---

[10]  The interest rate is based on using the formula approach approved by the Supreme Court in Till v. SCS Credit Corp. (In re Till), 541 U.S. 465, 476 n.14, 124 S.Ct. 1951 (2004). Kennedy argues that the proper present-value interest rate is the 21.5% discount rate used by the Debtors' appraiser in calculating the Property's value. The court believes the Till approach is correct but would add another 2% for the risk factor given the loan-to-value ratio and the depressed market for real estate in Arizona.

16

1  deprives Kennedy of significant bargained-for rights without compensating Kennedy for

2  the loss of those rights. While § 1123(a)(5)(E) and (F) permit the Debtors to modify

3  Kennedy's lien and contractual rights, they may only do so if they satisfy the

4  requirement of § 1129(b)(2)(A)(iii).

5

6     The crux of the problem lies in the lot release provisions. The 3rd Plan requires

7  Kennedy to release its lien on the Property for a flat lot release price well below the

8  Loan's requirement that Kennedy receive 70% of the sale proceeds.[11] Also,

9  the Loan, in a version of a "due on sale" provision, prohibits the Debtors from selling

10 Lot 50 unless the sale pays off the Loan. The 3rd Plan, however, provides for the

11 immediate sale of all but ten acres of Lot 50.

12

13    Where, as here, an undersecured creditor is required to release a portion of its

14 collateral before receiving payments equal to its full value, it is effectively impossible for

15 a debtor to propose a plan that will guarantee that the creditor is fully protected

16 because the creditor's collateral base is being eroded. In such cases, in order to meet

17 the indubitable equivalent standard, the creditor must be provided with some form of

18 substitute collateral. But, the 3rd Plan provides Kennedy with no substitutes at all. The

19

20 $3 million cash infusion may benefit the Project, but it is not a cash payment to

21

22

23

24

25

[11] The Debtors point out that the 3rd Plan provides the Debtors with a much smaller
26 percentage of the lot sale proceeds than the 90% of net lot sale proceeds advanced by
   Kennedy pre-petition. But those advances were based on Debtors not being in default of the
27 Loan. There is no question that the Loan is in default.

28                                           17

Kennedy which could be used to lower the debt and lower Kennedy's risk. There is no additional collateral pledged to Kennedy.[12]

The court recognizes the difficulties presented by § 1129(b)(2)(A) for real estate developers trying to reorganize, but Congress has decided that debtors must bear the risk of reorganization by contributing additional capital and/or pledging additional collateral to their undersecured creditors before debtors may enjoy the benefits of a confirmed plan.

## VI. CONCLUSION

In closing argument, counsel for the Unsecured Creditors' Committee pointed to the many benefits of plan confirmation, including payment of pre-petition taxes and a distribution of cash to Kennedy of over $5 million from the closing of the ten escrows, and from the sale of Lot 50. Confirmation would also mean the continued employment of people who work at the Project and assure that the Project would remain an environmentally sensitive development in some of the most beautiful desert in Southern Arizona. The argument was compelling, but not sufficient. The Code requires more than a reasonable proposal from a debtor to its impaired secured creditor. Here, it required the Debtors to propose a feasible plan that provided Kennedy with the indubitable

---

[12] The 3rd Plan permits the court to set the release prices if it finds $214,000 to be inadequate, but little purpose would be served by engaging in that exercise. Even if the lot release prices were set at the Loan rate of 70%, because Kennedy is undersecured and because of the early sale of most of Lot 50, § 1129(b)(2)(A)(iii) would still not be satisfied absent a pledge of additional or substitute collateral.

18

equivalent of its claim, and because the 3rd Plan fails to do so, it cannot be confirmed.

A separate order denying confirmation will be entered this date.

Dated and signed above.

Notice to be sent through the
Bankruptcy Noticing Center "BNC"
to the following:

Saguaro Ranch Development Corporation
P.O. Box 70207
Tucson, AZ 85737

Eric Slocum Sparks
Eric Slocum Sparks PC
110 S. Church Ave., Suite 2270
Tucson, AZ 85701

George O. Krauja
Laurel E. Davis
Fennemore Craig, P.C.
One S. Church Ave., Suite 1000
Tucson, AZ 85701-6800

Christopher J. Pattock
Office of the U.S. Trustee
230 N. First Ave., Suite 204
Phoenix, AZ 85003

Michael W. Baldwin
Law Office of Michael Baldwin, PLC
P.O. Box 35487
Tucson, AZ 85740-5487

Kevin J. Blakley
Gammage & Burnham, P.L.C.
Two N. Central Ave., 18th Floor
Phoenix, AZ 85004

Mark L. Collins
Gerard R. O'Meara
Gust Rosenfeld, P.L.C.
One S. Church Ave., Suite 1900
Tucson, AZ 85701-1627

19

| | |
|---|---|
| 1 | Sally M. Darcy |
| 2 | McEvoy, Daniels & Darcy, P.C.<br>4560 E. Camp Lowell Dr. |
| 3 | Tucson, AZ 85712-3854 |
| 4 | Neal A. Eckel |
| 5 | Durazzo & Eckel, P.C.<br>45 N. Tucson Blvd. |
| 6 | Tucson, AZ 85716 |
| 7 | Denise Faulk |
| 8 | Office of the Arizona Attorney General<br>400 W. Congress St. #N0223 |
| 9 | Tucson, AZ 85701-1367 |
| 10 | Jeffrey H. Greenberg |
| 11 | Stubbs & Schubart, P.C.<br>P.O. Box 50547 |
| 12 | Tucson, AZ 85703-0547 |
| 13 | Alan M. Levinsky |
| 14 | Buchalter Nemer<br>16435 N. Scottsdale Rd. #440 |
| 15 | Scottsdale, AZ 85254 |
| 16 | Terri A. Roberts |
| 17 | German Yusufov<br>Pima County Attorney's Office<br>32 N. Stone Ave., Suite 2100 |
| 18 | Tucson, AZ 85701 |
| 19 | Thomas P. Sarb |
| 20 | Miller Johnson<br>250 Monroe Ave. NW, Suite 800 |
| 21 | Grand Rapids, MI 49501-0306 |
| 22 | Robert J. Spurlock |
| 23 | Bonnett, Fairbourn, Friedman & Balint, P.C.<br>2901 N. Central Ave., Suite 100 |
| 24 | Phoenix, AZ 85012 |
| 25 | Daniel R. Warner |
| 26 | Law Offices of J. Phillip Glasscock, P.C.<br>13430 N. Scottsdale Rd., Suite 106 |
| 27 | Scottsdale, AZ 85254 |
| 28 | |

20

| 1 | Stephen M. Weeks |
| 2 | Weeks & Laird, PLLC |
|   | 2223 E. Speedway Blvd. |
| 3 | Tucson, AZ 85719 |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

21